# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 13-1073

———————————————

United States of America

*Plaintiff - Appellee*

v.

$45,000.00 in United States Currency

*Defendant*

Carlos Martins

*Claimant - Appellant*

——————————

Appeal from United States District Court
for the District of Nebraska – Omaha

——————————

Submitted: June 26, 2013
Filed: April 16, 2014

——————————

Before RILEY, Chief Judge, MELLOY and KELLY, Circuit Judges.

——————————

MELLOY, Circuit Judge.

Carlos Martins appeals the district court's order denying his post-trial motion to suppress evidence obtained as the result of a traffic stop. For the reasons set forth

below, we hold that the traffic stop was unconstitutional and that the district court erred by not suppressing the evidence. Accordingly, we reverse.

## I.  Background

On August 2, 2010, canine officer Deputy David Wintle saw Martins traveling west on Interstate 80 ("I-80") outside of Omaha, Nebraska.[1]  Deputy Wintle began following Martins and initially was unable to read the issuing state's name (Utah) on the license plate affixed to Martins's vehicle.  Martins then made a series of lane changes and subsequently exited the highway.  Deputy Wintle also exited and pulled over Martins for violating Nebraska Revised Statute § 60-399(2), which provides as follows:

> All letters, numbers, printing, writing, and other identification marks upon such [license] plates and [registration] certificate shall be kept clear and distinct and free from grease, dust, or other blurring matter, so that they shall be plainly visible at all times during daylight and under artificial light in the nighttime.

It was later determined that Martins had a back-up camera mounted near the top of his rear license plate.

During the traffic stop,  Deputy Wintle had to ask Martins several times to sit in his squad car with him while he processed paperwork before Martins complied. While in the squad car, Martins did not want to talk with Deputy Wintle or answer Deputy Wintle's questions and appeared "argumentative" (though it is uncontested that Martins never posed a physical threat to Deputy Wintle).  After all business

---

[1]There is conflicting testimony as to whether Deputy Wintle was also traveling west on I-80 or was pulled off to the shoulder and stationary as Martins passed him.

relating to Martins's license plate was completed,[2] and after Deputy Wintle returned Martins's driver's license and vehicle-registration papers to him, Deputy Wintle refused to allow Martins to leave the squad car. Deputy Wintle found it unusual that Martins, as an interstate traveler just passing through Nebraska on his way home to Utah, took the exit that he did because that exit does not provide easy access to fuel and other customary road-trip services and amenities. Deputy Wintle told Martins to "just sit tight" while he took his drug dog, Kubo, to sniff the exterior of Martins's vehicle. Kubo "alerted" at the rear of the vehicle and, after Deputy Wintle led him around to the other side, "indicated" at the passenger's side. This initial sniff took no more than two minutes. Deputy Wintle then called for assistance and subsequently conducted a full search of Martins's vehicle after a second officer arrived at the scene.

Deputy Wintle found the following items inside Martins's vehicle: a small rubber-banded bundle of money and loose cash in the pocket of a door; a sleeping pad in the back seat; two coolers that Deputy Wintle perceived as smelling of raw marijuana; and two vacuum-sealed bags of rubber-banded bundles of cash stored in a lock-box inside a factory-made storage area of the vehicle. The cash inside the vacuum-sealed bags totaled $45,000.00. No marijuana or other drugs were found.

Deputy Wintle seized the $45,000.00 and transported it back to the local sheriff's office where law-enforcement officers put Kubo through a series of tests. First, officers placed circulated and uncirculated money behind lockers; Kubo did not react. The officers then put the seized money in a locker and Kubo "indicated" at the locker where the money was hidden. Based on Kubo's reactions and Deputy Wintle's observations of Martins's behavior during the traffic stop and the contents of Martins's vehicle, the government suspected that the seized money was connected to drug trafficking and instituted a civil *in rem* forfeiture lawsuit against the currency. Martins, however, was not charged with any crime.

---

[2]Deputy Wintle did not issue a ticket to Martins for the alleged violation.

Prior to the forfeiture trial, Martins moved to suppress evidence obtained from the traffic stop. At a suppression hearing before a magistrate judge, Deputy Wintle testified on direct examination that he was not able to read Martins's license plate until after he exited I-80 and was stopping Martins:

> Q: . . . During the time that you're following [Martins] and up to the point where the two of you are stopped, have you . . . been able to see the plate more clearly?
>
> A: No, [be]cause I never really get close enough to him until the final traffic stop and that's when I get rather close to vehicles.
>
> Q: Okay. When were you able to determine then what state the plate was from?
>
> A: I'm not sure of the exact one. I know I advised my dispatch that it was a Utah plate, and it was—it was kind of a—a guess as to the way the letters were shaped that it—what I was seeing that it could be a Utah. . . .
>
> Q: When did you tell your dispatch that?
>
> A: As the vehicle was stopping, as I'm making the stop.

Suppression Hr'g Tr. 16–17, Jan. 10, 2012.

Based on the above testimony, the magistrate judge determined that Deputy Wintle had probable cause to believe that Martins was violating § 60-399(2) and recommended denying Martins's motion to suppress the evidence. The district court agreed and adopted the magistrate judge's recommendation in its entirety. Specifically, the district court adopted the following factual finding: "The [traffic] stop occurs somewhere on the exit . . . to West Center Road from I-80 and *at that time—or approximately at that time* it becomes known to [Deputy Wintle] that he is dealing with a Utah plate or what he has suspicion to be a Utah plate and that's

communicated with the dispatcher." Id. at 51 (emphasis added). The district court further stated the following regarding Deputy Wintle's basis for stopping Martins: "Deputy Wintle . . . stopped Martins's vehicle *because Deputy Wintle could not read the license plate on the rear of the vehicle*. Specifically, Deputy Wintle was unable to determine which state issued the plate." (Emphasis added.)

At the subsequent bench trial, Deputy Wintle testified differently regarding his ability to read Martins's license plate prior to stopping Martins:

> (On direct examination)
>
> Q: . . . What, if anything, drew your attention to [Martins]?
>
> A: When I observed his vehicle, I couldn't read his license plate. It had a—sort of a backup video camera mounted to the top of the plate that was obstructing the plate. I had to get close to the vehicle before I could actually see what state the vehicle was from.
>
> Q: So did you do that?
>
> A: Yes, I did.
>
> Q: And how did you go about doing that, Deputy?
>
> A: I just accelerated up and drove up close to him.
>
> Q: Okay. So you're driving next to him side by side?
>
> A: Yes. I didn't drive—I don't believe I actually drove up beside him but came within a hundred feet of him to see the plate.

Trial Tr. 13–14, Nov. 16, 2012.

(On cross-examination)

Q: You indicated on your direct testimony, sir, that you stopped [Martins's] vehicle as he was suspiciously exiting I-80; is that correct?

A: I stopped him for an obstructed license plate; but his leaving Interstate 80 raised some suspicions with me, yes.

Q: You indicated on your direct testimony that you had to get within a hundred feet in order to read the license plate; is that right?

A: Yes.

Q: And after you were able to read the license plate, he—I'm not trying to put words in your mouth, but he abruptly exited the highway?

A: I wouldn't say abruptly. Basically in a mile period he changed four lanes of traffic, so not abruptly, but it was a continuous lane change.

Q: So, as you're monitoring him, in your mind, this is a vehicle which is obviously out of place; is that correct?

A: I don't know if I understand what you mean by out of place.

Q: Strike that question, if I may. You recognize that this is a vehicle heading west with Utah plates; is that correct?

A: Yes.

Id. at 31–32.

After the forfeiture trial was completed, the district court determined that the government met its burden of proving by a preponderance of the evidence that a "substantial connection" existed between the seized money and drug trafficking, see

18 U.S.C. § 983(c)(1), (3), and ordered the $45,000.00 to be forfeited. Martins subsequently filed a post-trial motion for reconsideration of the district court's order denying his pretrial suppression motion, and the district court denied that motion as well. In denying Martins's motion for reconsideration, the district court stated that it

found "no material discrepancies" between Deputy Wintle's suppression-hearing testimony and his trial testimony.

Martins raises three issues on appeal. First, Martins argues that the district court erred in denying his post-trial motion for reconsideration. Specifically, Martins maintains that Deputy Wintle lacked probable cause to pull him over and that the initial traffic stop was unconstitutional in that it violated his Fourth Amendment right to be free from unreasonable seizures. Second, Martins argues that the subsequent canine sniff of his vehicle was also unconstitutional because Deputy Wintle had no basis to further detain him in the squad car after all business relating to the allegedly obstructed license plate was completed. Third, Martins argues that even if there were no constitutional violations leading up to the seizure of the $45,000.00, the government did not meet its burden of proving a "substantial connection."

## II. Analysis

This Court reviews de novo the district court's legal conclusions on a motion to suppress and reviews factual findings for clear error. United States v. Vanover, 630 F.3d 1108, 1113–14 (8th Cir. 2011). The Court will "affirm the district court's denial of a motion to suppress evidence unless it is unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, based on the entire record, it is clear a mistake was made." Id. at 1114 (citation and internal quotation marks omitted). "Because forfeiture proceedings are quasi-criminal in character, the exclusionary rule applies barring evidence obtained in violation of the

Fourth Amendment." United States v. $7,850.00 in U.S. Currency, 7 F.3d 1355, 1357 (8th Cir. 1993).

## A. Deputy Wintle's Conflicting Testimonies

Before analyzing the constitutionality of the traffic stop, it is necessary to address the inconsistencies between Deputy Wintle's testimonies. At the suppression hearing, Deputy Wintle testified that he had to "guess" that Martins's vehicle had a Utah license plate based on "the way the letters were shaped." (One could also assume that this was an "educated guess" given the fact that any police officer patrolling I-80 through Omaha would see virtually every state's license plates on a daily basis—particularly plates from those states through which I-80 passes, including Utah.) On the other hand, Deputy Wintle testified at trial that he was able to read Martins's license plate and tell which state issued the plate when he pulled to within 100 feet of Martins's vehicle. At trial, Deputy Wintle gave no indication that he had to "guess" as to the issuing state's name on Martins's license plate.

In the order denying Martins's post-trial motion for reconsideration, the district court indicated that she considered Deputy Wintle's testimony at trial—testimony that she personally observed—to be credible. She went on to state, however, that she did not consider there to be any material discrepancies between Deputy Wintle's testimony at the suppression hearing, in which he testified that he had to "guess" the issuing state of Martins's license plate, and his testimony at trial, in which he testified that he could read the license plate from within 100 feet. We disagree. For the reasons that we explain more fully below, it is our view that if Deputy Wintle could read Martins's license plate from within 100 feet of the vehicle, he lacked probable cause for a traffic stop.

After the district court made its preparatory statements that Deputy Wintle's trial testimony was credible and that there were no material discrepancies between his

-8-

trial testimony and suppression-hearing testimony, the district court then made a factual finding that Deputy Wintle "guessed" as to the state name on Martins's license plate. We recognize that "the [district] court's credibility determinations require a high degree of deference," United States v. Wright, 512 F.3d 466, 471 (8th Cir. 2008), and that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous," Anderson v. City of Bessemer City, 470 U.S. 564, 574 (1985). However, based on the district court's finding that Deputy Wintle's trial testimony was credible, we question how the district court can credit the earlier-given suppression-hearing testimony that she did not observe over the testimony that she did observe and found to be credible. The government argues in support of the district court that there are no inconsistencies between Deputy Wintle's testimonies, or to the extent that there is an inconsistency, it is irrelevant because there is no difference between a license plate that is partially obscured but still readable and a license plate that cannot be read at all. As previously stated, however, it is our conclusion that the difference is material, and that given the fact that Deputy Wintle very specifically testified, credibly, at trial that he could read Martins's license plate, any factual finding that Deputy Wintle had to guess as to the state name on the plate was clearly erroneous. See United States v. Martin, 982 F.2d 1236, 1240 n.2 (8th Cir. 1993) ("Our conclusion that the motion to suppress was properly denied is based in part upon the officers' subsequent testimony at trial . . . . [I]t is clear that, in reviewing the denial of a motion to suppress, *we must examine the entire record, not merely the evidence adduced at the suppression hearing.*" (emphasis added)); see also United States v. Blackshiers, 52 F.3d 331 (8th Cir. 1995) (per curiam) (unpublished table decision) (affirming, after trial, a pretrial order denying the defendant's motion to suppress and stating that "[g]*iven the testimony at trial*, the district court did not clearly err . . . ." (emphasis added)).

Our determination that the district court clearly erred in characterizing the facts in its order on Martins's motion for reconsideration does not resolve the ultimate issue before us—the constitutionality of the traffic stop. We turn now to whether Deputy

Wintle's stop of Martins violated the Fourth Amendment, accepting as true the facts as described in Deputy Wintle's later-given trial testimony that the district court found to be credible, i.e., that Deputy Wintle was able to read the issuing state's name on Martins's license plate from within 100 feet while traveling on I-80.

## B. Constitutionality of the Traffic Stop

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop constitutes a seizure under the Fourth Amendment." United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 2008) (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)). "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). "Any traffic violation, however minor, provides probable cause for a traffic stop." United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994) (en banc).

The objective standard governing an officer's decision to stop a motorist protects officers who have a mistaken belief that a traffic law is being broken. See United States v. Sanders, 196 F.3d 910, 913 (8th Cir. 1999) ("Even if the trailer was not technically in violation of the statute, [the officer] could have reasonably believed that the trailer violated the statute . . . ."). This standard cuts both ways, however, in that even if it is determined after a traffic stop that a motorist was in fact violating some law (traffic-related or otherwise), if it was not objectively reasonable for the officer to believe that a violation was occurring at the time that the officer decided to effect the stop, then the officer lacked probable cause to seize the motorist. Id. ("The determination of whether probable cause existed *is not to be made with the vision of hindsight*, but instead by looking to what the officer reasonably knew *at the time*." (emphases added)); see also Wong Sun v. United States, 371 U.S. 471, 484 (1963) ("[W]e have consistently rejected [the proposition] that a search unlawful at its inception may be validated by what it turns up."). Accordingly, the critical inquiry

in a probable-cause determination in the traffic-stop context is what the stopping officer observed *before* pulling over a motorist. See United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004) ("Probable cause for an arrest exists if, *at the moment the arrest was made*, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed." (emphasis added)). The government bears the burden of establishing that probable cause existed. See United States v. Andrews, 454 F.3d 919, 922 (8th Cir. 2006).

With this framework in mind, we turn now to the question of whether, based on the facts of this case as set forth in Deputy Wintle's trial testimony, Deputy Wintle had probable cause to pull over Martins.

### 1. Probable Cause Based on a Traffic Violation

We begin with the text of the law at issue. As set forth above, Nebraska Revised Statute § 60-399(2) provides as follows:

> All letters, numbers, printing, writing, and other identification marks upon such [license] plates and [registration] certificate shall be kept clear and distinct and free from grease, dust, or other blurring matter, so that they shall be plainly visible at all times during daylight and under artificial light in the nighttime.

The question we must answer is whether an interpretation of this statute exists under which an officer who could read a license plate from within 100 feet could reasonably believe there had been a violation of the statute. The answer to this question, we conclude, turns on the meaning of the phrase "plainly visible." If the Nebraska legislature intended that phrase to outlaw any and all de minimis blurring or obstruction without reference to readability, then Deputy Wintle acted reasonably.

-11-

If, however, the phrase "plainly visible" enjoys a practical meaning such as "readable," or "reasonably readable," or even more contextually, "generally readable for law enforcement and identification purposes from within a reasonable distance," then Deputy Wintle's mistake is not excusable as a reasonable mistake.

As the following cases illustrate, a standard of readability has been the standard applied by Nebraska courts. And, our holding with this interpretation does not require officers to be legal technicians. United States v. Martin, 411 F.3d 998, 1001 (8th Cir. 2005) ("We 'should not expect state highway patrolmen to interpret the traffic laws with the subtlety and expertise of a criminal defense attorney.'"(quoting Sanders, 196 F.3d at 913)). It requires only that they "understand the laws that they are entrusted with enforcing, at least to a level that is objectively reasonable," id., and not stop citizens on the street on the authority of § 60-399(2) when the license plate is otherwise readable from within 100 feet.[3]

In State v. Richardson, for example, the defendant was pulled over when a patrol officer, traveling in the opposite direction of the defendant, initially did not see any license plate on the front of the defendant's vehicle. 763 N.W.2d 420, 423, 425 (Neb. Ct. App. 2008). The officer testified that, before he turned around to get behind the defendant, he was able to see a license plate "in the front window of the vehicle, 'tucked in' between the glass and the dashboard," but "was unable to ascertain the numbers or see the plate clearly." Id. at 425. During the stop, the officer learned that the defendant's license had been suspended, and the officer arrested the defendant. Id. The defendant filed a motion to suppress evidence obtained from the stop, arguing that the officer lacked probable cause to stop him, and the trial court denied

---

[3]With this interpretation, a great deal of flexibility remains within which an officer might reasonably stop a car under the authority of § 60-399(2) even though a court might later find there to have been no violation. That range of flexibility, however, does not extend so far as to make it reasonable to believe that a plate readable from within 100 feet violated the statute.

the motion. The Nebraska Court of Appeals affirmed, noting that "[a]lthough [the officer] could see that a license plate had been placed against the front windshield, he was unable to *read* the numbers on the plate," in violation of § 60-399(2). Id. at 426 (emphasis added). The court, therefore, focused on readability as a standard in the application of § 60-399(2).

Unlike the officer in Richardson, Deputy Wintle *could* read the state name on Martins's license plate from a reasonable position[4] and not merely after he stopped Martins. See id. A license plate is not a billboard. The fact that Deputy Wintle initially could not ascertain the issuing state's name on Martins's license plate as Martins traveled ahead of him at a distance greater than 100 feet[5] and "in the next lane over" (per Deputy Wintle's trial testimony) does not give Deputy Wintle probable cause to believe that Martins was violating § 60-399(2); otherwise, an officer could pull over a motorist just because the motorist's vehicle is, for example, a great distance in front of the officer, at a sharp angle to the officer, or positioned between the officer and the sun on a bright day. See Wong Sun, 371 U.S. at 484 ("A contrary holding here would mean that a vague suspicion could be transformed into probable cause for arrest by reason of ambiguous conduct *which the arresting officers*

---

[4]The parties do not argue over the merits of the 100-foot distance itself, but we note that 100 feet is approximately six to seven average vehicle lengths, and this spacing does not require Deputy Wintle to tailgate Martins or follow him at an unsafe distance to ascertain the issuing state's name on Martins's license plate. Compare Neb. Rev. Stat. § 60-6,140(1) ("The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, and such driver shall have due regard for the speed of such vehicles and the traffic upon and the condition of the roadway."), with State v. Draganescu, 755 N.W.2d 57, 73–74 (Neb. 2008) (objective standard for police officers is to allow one car length between vehicles for every ten miles per hour of speed).

[5]Deputy Wintle testified at trial that he "just accelerated up and drove up close to [Martins]" to get within 100 feet of Martins and see Martins's license plate. Trial Tr. 14.

-13-

*themselves have provoked*." (emphasis added)); United States v. Yousif, 308 F.3d 820, 829 (8th Cir. 2002) ("Reasonable suspicion cannot be manufactured by the police themselves.").

State v. Reiter, 524 N.W.2d 575 (Neb. Ct. App. 1994), is also instructive. In Reiter, the defendant was pulled over around 3:30 AM when an officer saw him driving without any license plates and apparently without any in-transit tags, as required by Nebraska law. Id. at 577. Only after the defendant stopped his vehicle and the officer shined a spotlight on the vehicle did the officer see a piece of paper in the rear window. Id. Upon further inspection and contact with the driver, the officer noticed a strong odor of alcohol in the vehicle and subsequently arrested the defendant for drunk driving and driving on a suspended license. Id. The defendant moved to suppress the evidence from the stop because "although the initial stop may have been proper [when the officer could not see any in-transit tags], after the officer became aware of registration compliance [i.e., when he saw the tags with the spotlight], he should not have had contact with [the defendant]." Id. at 578. The trial court denied the suppression motion and the Nebraska Court of Appeals affirmed. The appellate court noted that "[the defendant's] argument rests on the pivotal factual assumption that [the officer] determined that [the defendant] had proper in-transit tags prior to making contact with him[,] . . . [but] it was not clear when, if ever, the officer became aware of the in-transit tags."[6] Id. Here, by contrast, Deputy Wintle stated at

_____

[6]We note that Reiter was decided in 1994, i.e., before the 2005 amendments to the relevant statute took place, see infra note 8. However, the court in Reiter equated the then-applicable statutory language requiring proper "display" of a license plate to mean "visible." 524 N.W.2d at 578 ("The statutory expression requiring 'proper display' of plates and in-transit tags logically implies a display which is visible."). Although the court did not elaborate on what, exactly, "visible" means, we note that in its recitation of facts, the Reiter court stated that the officer "turned on his spotlight, shined it into the back window, and then noticed a piece of paper in the rear window, but could not tell *what the paper said* at that point." Id. at 577 (emphasis added). Accordingly, even though the Reiter court operated under a different

-14-

trial exactly when he could read (and thus "became aware," see id.) that Martins's vehicle had a Utah license plate—when Deputy Wintle "came [to] within a hundred feet of [Martins]" and while still traveling on I-80.  Trial Tr. 14.

Our Circuit has had the opportunity to review other states' license plate display statutes but has never held that a plate readable from 100 feet can be reasonably characterized as not being "plainly visible."  In United States v. Harris, 617 F.3d 977, 978–79 (8th Cir. 2010), for example, we addressed a Missouri statute that required license plates to be "plainly visible."  There, the officer who conducted the traffic stop "testified that he had to '*get right up on the vehicle to get the license plate*.'"  Id. at 978 (emphasis added).  Although the defendant in that case argued the traffic stop was invalid because the officer could read the plate, we held the officer had acted reasonably."[7]  This is consistent with a practical and objectively reasonable standard that would differentiate between a plate so obscured that an officer "had to 'get right up on the vehicle'" and a plate that was readable from within 100 feet.

statutory framework, we nevertheless find support in it for the proposition that one's ability to read a license plate is indicative of the license plate being "visible" within the meaning of § 60-399(2).

[7]The dissent relies in part on Parks v. State, 247 P.3d 857, 860 (Wyo. 2011), citing dicta from that court stating that "'plainly visible' and 'clearly legible' indicate that a license plate must not be obstructed in any manner."  Id. at 860.  That statement, however, accompanied the Wyoming court's description of the purpose of the statute, which is: "License plates need to be easily read in order to facilitate law enforcement and ordinary citizens in reporting and investigating hit-and-run accidents, traffic violations, gas-pump drive offs, and other criminal activity."  Id. And, the actual facts of Parks involved officer testimony—testimony found credible and relied upon by the Wyoming court—in which the officer stated he could not read the numbers on the plate "while following" the defendant's vehicle because a trailer-hitch ball mount obstructed the numbers.  Id. at 859.

Finally, we note that in the order denying Martins's motion for reconsideration, the district court stated the following regarding one of Martins's trial exhibits:

> Martins's own Exhibit . . . show[s] his rear license plate in a bracket, with a back-up camera mounted above the plate. The camera obscures the top half of the name of the issuing state: "Utah." The photo[] appear[s] to be taken at a direct angle, *i.e.*, at the same height as the plate. Anyone viewing the license plate from an angle above the plate, *e.g.*, any driver of another vehicle, would see less than half the lettering identifying the issuing state.

From our reading of Nebraska cases decided both before and after the 2005 amendment to the statute, see infra note 8, the essence of "visibility" has always been an officer's ability to read text on a license plate, not a post-arrest determination regarding the percentage or portion of text that is covered. See Richardson, 763 N.W.2d at 426 ("Although [the officer] could see that a license plate had been placed against the front windshield, he was unable to *read* the numbers on the plate." (emphasis added)); Reiter, 524 N.W.2d at 577 ("[The officer] noticed a piece of paper in the rear window, but could not tell *what the paper said* at that point." (emphasis added)); see also State v. O'Dell, No. A-01-1274, 2002 WL 31107578, at *6 (Neb. Ct. App. Sept. 24, 2002) (unpublished) (rejecting "the State's argument . . . that [an officer's] inability to completely see [a] rear license plate because of [a] trailer hitch provided the basis to stop [a motorist] for a traffic violation," and stating that a motorist does not commit the "crime of 'improper display' of plates if a law enforcement officer cannot see 100 percent of the plate").[8] Here, Deputy Wintle

---

[8]We note that at the time that O'Dell was decided, Nebraska motorists were required only to "display" license plates on the front and back of a vehicle. See Neb. Rev. Stat. § 60-323 (2004). The relevant statute was amended in 2005, however, and the current version—and the version in place when Martins was stopped—requires that license plates be "plainly visible." Id. § 60-399(2) (2005). Nevertheless, we find

testified at trial that he was able to read Martins's license plate from within 100 feet. Trial Tr. 31 (Q: You indicated in your direct testimony that you had to get within a hundred feet in order to read [Martins's] license plate; is that right? A: Yes.). Based on this testimony, it was not objectively reasonable to believe that Martins was violating § 60-399(2), and thus Deputy Wintle lacked probable cause to stop him.[9]

The government cites several Eighth Circuit cases in support of the proposition that it was objectively reasonable for Deputy Wintle to believe that Martins was violating § 60-399(2). The government's cases are not applicable to the issue before us, however, because they each present the same set of materially distinguishable facts. In each of those cases, the law-enforcement officers were not able to ascertain the relevant information *prior to* stopping the defendants, and thus had probable cause to believe that a law was being broken at the time of the seizures.

---

O'Dell to be persuasive based on its analogous facts and on the fact that it has not been questioned or overruled.

[9]The dissent characterizes the present case as simple and appears to use the conclusions of Deputy Wintle, the magistrate judge, and the district court judge in this case as support for the legal conclusion that Deputy Wintle acted reasonably. No doubt, this reasonableness-in-numbers approach holds substantial rhetorical appeal. And the dissent correctly notes that we must give "due weight to inferences drawn from . . . facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690, 699 (1996). The present issue, however, is not a fact question. It is a question of law. United States v. Washington, 455 F.3d 824, 826 (8th Cir. 2006) ("We review the district court's . . . legal conclusions about probable cause and reasonable suspicion de novo."). Having separately reviewed the fact question in our Section II.A and having reached our conclusion, deference to the underlying courts regarding the ultimate legal question of reasonableness is not appropriate. In fact, it would seem inconsistent with our obligation to conduct a de novo review. In other words, we cannot carry out our function of appellate judicial review by relying on the lower courts' determination of reasonableness to decide what is reasonable.

In United States v. Sanchez, this Court stated the following:

> [I]t was objectively reasonable for [the officer] to suspect at the time of the stop that the paper affixed to the rear of the minivan was not an official registration document from another State. As he approached the minivan from behind, [the officer] could not see the name of any State printed on the paper. Although the words 'Arizona Temporary Registration Plate' appeared at the bottom of the paper, the district court did not clearly err in finding that *those words were too small to be read by a trooper observing the minivan on the highway.*

572 F.3d 475, 478–79 (8th Cir. 2009) (emphasis added).[10]  By contrast, Deputy Wintle was clear in his trial testimony that he was able to read "Utah" while still traveling a safe distance behind Martins on I-80.  See supra note 4.

Similarly, in United States v. Smart—also cited by the government—it was not until after the officer stopped the defendant that the officer was able to ascertain the issuing state's name on the defendant's license plate to determine whether it was proper that the defendant did not have a front license plate, which is required of vehicles registered in Iowa and certain other states.  393 F.3d 767, 769 (8th Cir. 2005).  This Court set forth the facts of Smart as follows:

---

[10]We note that the government, when discussing Sanchez in its brief, omits from its lengthy block quote the sentence beginning "Although the words" and ending "too small to be read by a trooper observing the minivan on the highway."  See 572 F.3d at 479.  This omission is significant for distinguishing Sanchez from this case because in Sanchez, the trooper could not read the relevant information while "on the highway," see id., whereas here, Deputy Wintle testified at trial that he could read Martins's license plate while traveling on I-80.  See Trial Tr. 14 ("I don't believe I actually drove up beside [Martins] but came within a hundred feet of him to see [his] plate.").

As [the officer] approached the [defendant's vehicle] from behind [while driving], the officer observed that it had a rear plate, but he could not determine from his distance what state had issued that plate. . . . Because the vehicle's failure to display a front license plate was a possible traffic violation, [the officer] activated his emergency lights and stopped the car for an investigation. . . . *It was only after [the defendant's] car had stopped and [the officer] approached it on foot that he noticed that there was a Georgia plate on the rear of the car.*

Id. (emphasis added).

Just the same, in United States v. Hollins, "Omaha police spotted the [defendant's] SUV, noticed the lack of license plates, stopped the vehicle, and shined a spotlight on it." 685 F.3d 703, 705 (8th Cir. 2012). As is relevant to the issue before us, "[w]hen the officers initially observed and stopped the SUV, it did not bear license plates, and they could not see the In Transit sticker." Id. at 706.

Like in the Nebraska cases Richardson and Reiter, the officers in Sanchez, Smart, and Hollins did not possess the relevant information to determine that no traffic violations were occurring until *after* they stopped the defendants; by contrast, Deputy Wintle testified at trial that he could read that Martins had a Utah license plate prior to pulling over Martins and while traveling on I-80. This fact pertaining to what Deputy Wintle knew—and when—is critical in the probable-cause analysis and renders the government's cases inapposite.

## 2. Probable Cause Based on Suspicious Behavior

Multiple innocent and lawful acts, when "viewed in the aggregate by a trained law enforcement officer," can provide the necessary level of suspicion to justify a stop. United States v. Walker, 324 F.3d 1032, 1037 (8th Cir. 2003); see United States v. Stewart, 631 F.3d 453, 457 (8th Cir. 2011) ("[F]actors that individually may be

consistent with innocent behavior, when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent."). Here, Deputy Wintle testified at trial that Martins's choice of a particular exit off of I-80 "raised some suspicion." Trial Tr. 31; see id. at 15 ("It's not normal for vehicles traveling cross-country on vacations or whatever to get off on West Center Road. It's not a normal ramp."). Deputy Wintle also described his duties as a narcotics interdiction officer: "We're trying to stop the movement of criminal activity along Interstate 80, whether it's traveling all the way across country or state to state. . . . [W]e don't try and just target one area[,] [but] we primarily run into narcotics and narcotics trafficking[.]" Id. at 7. Although not fully briefed, we address and reject below any residual argument by the government that Deputy Wintle had probable cause to stop Martins for his allegedly suspicious interstate-travel behavior.

This Court has several times suppressed evidence obtained as a result of unconstitutional seizures occasioned by officers' suspicion, where such suspicion was based solely on the fact that defendants were engaging in legal activity that merely appeared out of the ordinary. In United States v. Yousif, for example, police officers set up signs along a Missouri highway known to be a drug-trafficking route alerting drivers of a checkpoint ahead; the actual checkpoint, however, was at the end of the exit ramp for the exit after the checkpoint signs. 308 F.3d 820, 823–24 (8th Cir. 2002). The defendant drove a vehicle with Oklahoma license plates, took the exit where officers were running the checkpoint (albeit unbeknownst to the defendant when he exited), and slowed halfway up the exit ramp when he saw police officers. Id. at 824. Police officers stopped the defendant and found marijuana in his vehicle. Id. The defendant moved to suppress the evidence, claiming that the stop violated his Fourth Amendment rights. Notwithstanding the Supreme Court's holding in City of Indianapolis v. Edmond, 531 U.S. 32 (2000),[11] the district court held that the

_____

[11]In Edmond, the Court held that "[w]hen law enforcement authorities pursue primarily general crime control purposes at checkpoints . . . , stops can only be justified by some quantum of individualized suspicion." 531 U.S. at 47.

defendant's "voluntary consent to the search of his vehicle nevertheless provided an independent basis for denying the motion to suppress." Yousif, 308 F.3d at 826–27.

The defendant appealed, and the government argued on appeal that even if the checkpoint was unconstitutional under Edmond, "the totality of the circumstances noted by [the officer] prior to the stop of [the defendant's] vehicle sufficed to create individualized reasonable suspicion, thereby rendering the stop in this particular case constitutionally permissible." Id. at 828. According to the government, those circumstances included: "that [the defendant] was driving on a highway that was known to be used for drug trafficking, his car had out-of-state license plates, he pulled off at a rural exit immediately after seeing signs warning of a drug checkpoint ahead, and he slowed almost to a complete stop upon seeing the police checkpoint ahead." Id. This Court rejected that argument and vacated the district court's order denying the motion to suppress, stating:

> The facts that [the defendant's] vehicle had out-of-state license plates and was traveling on a highway that was "known" to the officers as a drug trafficking corridor cannot alone justify the stop because "[t]oo many people fit this description for it to justify a reasonable suspicion of criminal activity." . . . Moreover, because there is nothing inherently unlawful or suspicious about a vehicle (even one with out-of-state license plates) exiting the highway, it should not be the case that the placement of signs by the police in front of the exit ramp transforms that facially innocent behavior into grounds for suspecting criminal activity.

Id. at 828–29 (quoting United States v. Gray, 213 F.3d 998, 1001 (8th Cir. 2000)).

Similar to Yousif, in United States v. Jones, an officer saw the defendant "walking across a church parking lot wearing a long-sleeved hooded sweatshirt and 'clutching the front area of his hoodie pocket with his right hand.'" 606 F.3d 964, 965

-21-

(8th Cir. 2010) (per curiam). The defendant noticed the officer's squad car, and the officer, after circling the block and regaining sight of the defendant, stopped and patted down the defendant to look for weapons. Id. The officer found a 9 millimeter handgun in the front pocket of the defendant's sweatshirt and a loaded magazine in the defendant's back pants pocket. The officer later determined that the defendant had prior felony drug convictions, and the defendant was indicted for being a felon in possession of a firearm. Id.

The defendant moved to suppress the evidence on the ground that the officer lacked reasonable suspicion to stop and frisk him, and the district court granted the motion. The government appealed, arguing that the circumstances surrounding the stop gave the trained officer reasonable suspicion of illegal activity. Id. at 966. This Court affirmed the district court's order suppressing the evidence, stating the following:

> The government does suggest the presence of other suspicious circumstances, but all were shared by countless, wholly innocent persons—walking in a high-crime area, wearing a sweatshirt on a September day that began at a cool 50 degrees in the morning but warmed to 68 degrees by late afternoon, and intently watching a police cruiser drive by. In other words, the totality of these circumstances, on which our inquiry must be based, adds nothing to [the defendant's] protective clutching of *something* in his hoodie pocket.
>
> . . . With only this circumstance to support [the officer's] suspicion, though we are mindful of the need to credit law enforcement officers who draw on their experience and specialized training, we conclude that "[t]oo many people fit this description for it to justify a reasonable suspicion of criminal activity."

Id. at 967 (quoting Gray, 213 F.3d at 1001).

-22-

The Nebraska Supreme Court has reached a conclusion similar to the conclusions in Yousif and Jones when applying Nebraska's traffic laws. In State v. Childs, an officer pulled over the defendant when the officer noticed in-transit stickers on both the front and rear of the defendant's vehicle. 495 N.W.2d 475, 476–77 (Neb. 1993). The officer "walked by the 'In Transit' sticker displayed on one of the [vehicle's] windows, noted that the sticker was still within the In Transit period and was therefore valid" and that the sticker was displayed in the correct location on the vehicle; nonetheless, the officer went to the driver's window to ask the defendant for a bill of sale. Id. at 477. The officer noticed that the defendant appeared intoxicated, and the defendant was arrested for drunk driving. Id. The defendant moved to suppress the evidence, which the trial court denied and an appeals court affirmed. The Nebraska Supreme Court, however, reversed and ruled that the defendant's Fourth Amendment rights had been violated. The government argued in Childs that the officer "had a particularized suspicion that [the defendant] was violating [Nebraska law] because, in every situation where a motorist drives a car displaying an In Transit decal, the officer who sees a car being driven on a street without plates should suspect a violation is occurring in his presence." Id. at 481 (internal quotation marks omitted). The Nebraska Supreme Court, after reviewing several U.S. Supreme Court cases, rejected this argument, stating that "the result would be a constitutionally suspect presumption that every motorist who uses In Transit decals is presumed to be a lawbreaker involved in criminal activity." Id. at 481.

The reasoning in Yousif, Jones, and Childs applies equally to this case. That Martins drove a vehicle with non-Nebraska license plates and exited from I-80 at an unlikely exit for cross-country travelers (according to Deputy Wintle) does not provide Deputy Wintle with the requisite level of suspicion to stop him. See Reid v. Georgia, 448 U.S. 438, 441 (1980) ("The other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure."); Johnson v. Campbell, 332 F.3d 199, 208 (3d Cir. 2003)

("There are limits . . . to how far police training and experience can go towards finding latent criminality in innocent acts."). Moreover, even if Deputy Wintle became aware of certain other "indicators" that amounted to reasonable suspicion for him to believe that Martins was involved in drug trafficking—e.g., Martins's "agitated attitude . . . throughout the stop," the sleeping pad in the back of Martins's vehicle, and Kubo's reactions, see Trial Tr. 25—Deputy Wintle did not become aware of these indicators until *after* he stopped Martins. The only possible basis for pulling over Martins in the first instance (other than for the alleged violation of § 60-399(2), which we have already rejected) was that Martins had a Utah license plate and took a certain exit off of I-80. The traffic stop was thus, for constitutional purposes, baseless.

## III. Conclusion

For the reasons set forth above, we hold that the initial traffic stop violated Martins's Fourth Amendment rights and any evidence obtained as a result should have been suppressed. Accordingly, we need not reach the second and third issues that Martins raises on appeal pertaining to the canine sniff and the connection between the seized currency and drug trafficking.

The judgment of the district court is reversed.

RILEY, Chief Judge, dissenting.

The court unduly complicates a straightforward case which turns on a simple question: Could a reasonable Nebraska law enforcement officer look at a license plate with more than half of the state name concealed[12] and conclude the "letters" of

---

[12]The district court found, as a matter of fact, the record photographs of the rear of Martins's vehicle, which were "taken at a direct angle, *i.e.*, the same height as the plate," showed that the rear-view "camera obscure[d] the top half of the name of the issuing state: 'Utah'"—meaning "[a]nyone viewing the license plate, *e.g.*, any driver

-24-

the state name were not "clear and distinct . . . so that they [were] plainly visible"? Neb. Rev. Stat. § 60-399(2). Of course the officer could. The experienced officer in this case—with over twenty years patrolling for the Douglas County, Nebraska, Sheriff's Department—thought so. The magistrate judge—who has more than three decades of judicial service at the Nebraska state and federal levels—thought so, as did the experienced district judge. I think so too. Even Martins at the time of the stop told Deputy Wintle "he was aware of [the license plate] violation, and he had been stopped for it in the past." These conclusions are overwhelmingly supported by precedent from this circuit,[13] other circuits,[14] and other states,[15] interpreting similarly worded statutes.

The majority not only devises an unprecedented interpretation of § 60-399(2)—an interpretation I am confident the Nebraska Supreme Court will reject when given the opportunity—but decrees that the contrary interpretation adopted by

of another vehicle, would see less than half the lettering identifying the issuing state." Mindful that "[o]ne picture can be worth a thousand words[,] [a]nd fewer words are sometimes better than many," United States v. Walton, 207 F.3d 694, 699 (4th Cir. 2000) (Wilkinson, C.J., concurring), I append two photographs of the plate in question to allow the reader to determine whether the obstruction of the issuing state is as "de minimis" as the majority claims. Ante at 11.

[13]See, e.g., United States v. Harris, 617 F.3d 977, 978-79 (8th Cir. 2010) (determining a Missouri police officer reasonably interpreted a statute requiring license plates to be "plainly visible" to require more than mere readability).

[14]See, e.g., United States v. Contreras-Trevino, 448 F.3d 821, 824-25 (5th Cir. 2006) (holding a license plate frame "that covered the top half of the [state name]" gave officers probable cause to initiate a traffic stop for violation of a statute prohibiting objects that "alter[] or obscure[] the letters or numbers on the plate").

[15]See, e.g., Hinojosa v. State, 319 S.W.3d 258, 262 (Ark. 2009) (deciding officers had probable cause to believe a license plate frame that obscured the state name, making the plate more difficult to read, violated a state law requiring that license plates be "clearly visible").

-25-

the experienced Nebraska officer, magistrate judge, district judge, and this circuit judge is beyond the objective pale of reason. Believing the opposite is true, I respectfully dissent.

## A.     Fourth Amendment

"Under the Fourth Amendment, a traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred." United States v. Washington, 455 F.3d 824, 826 (8th Cir. 2006). "Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible. They are commonsense, *nontechnical* conceptions that deal with 'the factual and practical considerations of everyday life on which reasonable and prudent men, *not legal technicians*, act.'" Ornelas v. United States, 517 U.S. 690, 695 (1996) (emphasis added) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)).

"A law enforcement officer has reasonable suspicion when the officer is aware of 'particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.'" United States v. Houston, 548 F.3d 1151, 1153 (8th Cir. 2008) (quoting United States v. Martin, 706 F.2d 263, 265 (8th Cir. 1983)). In reviewing reasonable suspicion determinations, the Supreme Court explains we must:

> give due weight to inferences drawn from those facts by *resident* judges and *local* law enforcement officers.

Ornelas, 517 U.S. at 699 (emphasis added). Reasonable suspicion to support a traffic stop requires far less evidence of guilt than "'would justify condemnation' or conviction," Brinegar v. United States, 338 U.S. 160, 175 (1949) (quoting Locke v. United States, 11 U.S. (7 Cranch) 339, 348 (1813) (Marshall, C.J.)).

"The determinative question is not whether [Martins] actually violated [§ 60-399(2)], but whether an objectively reasonable police officer could have formed a

reasonable suspicion that [Martins] was committing a [statutory] violation." United States v. Martin, 411 F.3d 998, 1001 (8th Cir. 2005). "Even if [Deputy Wintle] was mistaken in concluding that a traffic violation occurred, the stop does not violate the Fourth Amendment if the mistake was an 'objectively reasonable one.'" United States v. Herrera-Gonzalez, 474 F.3d 1105, 1109 (8th Cir. 2007) (quoting Martin, 411 F.3d at 1001).

Though the majority concedes "we should not expect state highway patrolmen to interpret the traffic laws with the subtlety and expertise of a criminal defense attorney," ante at 12 (quoting Martin, 411 F.3d at 1001) (internal marks omitted), the majority requires precisely that—and more. The majority acknowledges "[t]he objective standard governing an officer's decision to stop a motorist protects officers who have a mistaken belief that a traffic law is being broken," id. at 10 (citing United States v. Sanders, 196 F.3d 910, 913 (8th Cir. 1999)), yet concludes not only that Deputy Wintle made a mistake, but that "Deputy Wintle's mistake [was] not excusable as a reasonable mistake" because, in the majority's view, Martins's plate was "reasonably readable" or "generally readable" at some unspecified "reasonable" distance. Ante at 11-12. Without explanation, the majority reassures us "a great deal of flexibility remains within which an officer might reasonably stop a car under the authority of § 60-399(2)"—just not in this case. Ante at 12 n.3.

If officers retain "a great deal of flexibility" in determining whether an obstructed plate violates the statute, surely an experienced officer who was unable to readily identify the plate as Martins passed him on the interstate had a reasonable basis to believe the name of the issuing state was sufficiently obstructed to no longer be "clear and distinct" and "plainly visible" as required by § 60-399(2), even if a majority of this panel later finds there was no violation. See United States v. Smart, 393 F.3d 767, 771 (8th Cir. 2005) ("The possibility that there was no violation, and the subsequent determination that there was not, does not mean that the initial suspicion was unreasonable.").

-27-

The majority's analysis suffers from three main flaws: first, the majority is too quick to reject the district court's harmonization of Deputy Wintle's testimony, see Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985) ("If the district court's account of the evidence is *plausible* in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." (emphasis added)); second, the majority's interpretation of § 60-399(2) does not give the statute its plain and ordinary meaning as required by Nebraska law; and third, the majority's opinion leaves no room for reasonable mistakes.

## B.     Deputy Wintle's Testimony

After reviewing Deputy Wintle's hearing testimony and observing him testify at trial, the district court found Deputy Wintle credible and found "no material discrepancies" between his suppression hearing and trial testimonies.  Despite acknowledging "that '[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous,'" the majority "disagree[s]" with the district court, finding Deputy Wintle's testimony "at trial that he could read Martins's license plate" rendered the district court's factual findings regarding the plate clearly erroneous.  Ante at 8, 9, 17 n.9 (quoting Anderson, 470 U.S. at 574).  The majority then "accept[s] as true the facts as described in Deputy Wintle's later-given trial testimony . . . , i.e., that Deputy Wintle was able to read the issuing state's name on Martins's license plate from within 100 feet while traveling on I-80." Ante at 9-10.  Although I suggest the majority's factual analysis "oversteps the bounds" of our duty as an appellate court reviewing for clear error, Anderson, 470 U.S. at 573 ("The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court."); see also Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123 (1969) ("In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide *factual* issues *de novo*." (emphasis added)), the majority also reads too much into this one phrase from Deputy Wintle's trial testimony.

-28-

At trial, Deputy Wintle testified he did not "believe [he] actually drove up beside [Martins] but came *within a hundred* feet of [Martins] to see the plate." (Emphasis added). Even if we assume the slight differences between Deputy Wintle's testimonies required the district court to base its factual findings only on one phrase in Deputy Wintle's trial testimony, that testimony cannot bear the load the majority places on it because it does not establish exactly how close to the vehicle Deputy Wintle had to get to read the plate. The majority decides the plate was "readable from 100 feet," even "not[ing] that 100 feet is approximately six to seven average vehicle lengths, and this spacing does not require Deputy Wintle to tailgate Martins or follow him at an unsafe distance to ascertain the issuing state's name on Martins's license plate." Ante at 11, 13 n.4, 15.

But none of that factfinding is in the record. Deputy Wintle testified in context that he "accelerated up and drove up *close* to [Martins]" and "had to get *close* to the vehicle before [he] could actually see what state the vehicle was from" but not so close as to "actually dr[i]ve up beside [Martins]." (Emphasis added). Beyond that, Deputy Wintle's testimony does not specifically say how close *within the range* of that "100-foot distance" Deputy Wintle had to get to Martins's vehicle to decipher the obstructed name of the issuing state. Ante at 13 n.4. Critically, the video recording of the traffic stop indicates Deputy Wintle did not identify Martins's license plate to the dispatcher until Martins had exited the interstate and both vehicles were nearly stopped on the shoulder. At that point, Deputy Wintle was no more than one or two "average vehicle lengths" from Martins's license plate when he identified Utah as the issuing state—a short distance well "within 100 feet of Martins's vehicle." Ante at 8. The video fully supports Deputy Wintle's testimony that he "never really g[o]t close enough to [Martins's vehicle to see the plate clearly] until the final traffic stop." These key undisputed record facts, ignored by the majority, mean the district court's findings are at the very least *plausible*. And that is all we can ask for on appeal. See Anderson, 470 U.S. at 573-74.

## C.      Plain Meaning of § 60-399(2)

Section 60-399(2) requires "[a]ll letters, numbers, printing, writing, and other identification marks" on a license plate "be kept clear and distinct . . . so that they shall be plainly visible at all times." As should be clear from the majority opinion, the Nebraska Supreme Court has not interpreted § 60-399(2), and the few lower court cases considering related issues have not examined the statutory language at issue in this case. See, e.g., ante at 14 n.6, 16 n.8 (explaining that two of the three Nebraska cases the majority cites in construing § 60-399 involved a different statutory scheme that only required motorists to "display" the license plates and that the court in State v. Reiter, 524 N.W.2d 575, 578 (Neb. Ct. App. 1994), "did not elaborate on what, exactly, 'visible'" meant as used in the opinion but not in the statute). Under Nebraska law, "statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous." State v. Sikes, 834 N.W.2d 609, 614 (Neb. 2013). The plain and ordinary meaning of the operative terms in § 60-399(2) demonstrates Deputy Wintle had an objectively reasonable basis for the stop.

Definitions of the term "clear" include "easily visible or distinguishable" and "free from obstruction, burden, limitation, defect, or other restricting features." Webster's Third New International Dictionary 419 (1993). The term "distinct" means "capable of being easily perceived" and "readily seen . . . through sharp, clear, unmistakable impression: not blurred, obscured, or indefinite." Id. at 659. Definitions of the term "plainly" include "with clarity of perception or comprehension," "clearly," "in unmistakable terms," and "in a plain manner." Id. at 1729. And "visible" means "easily seen" and "conspicuous." Id. at 2557. Martins's plate does not readily fit these definitions.

Construing some of the same statutory terms, the Wyoming Supreme Court, which the Nebraska Supreme Court has long consulted in matters of statutory interpretation, see, e.g., Sullivan v. Storz, 55 N.W.2d 499, 502 (Neb. 1952) (citing Anderson v. Englehart, 105 P. 571, 575 (Wyo. 1909)), recently held "[t]he

requirements that a license plate be 'plainly visible' and 'clearly legible' indicate that a license plate must not be obstructed *in any manner*." Parks v. State, 247 P.3d 857, 860 (Wyo. 2011) (emphasis added). The court reasoned, "This interpretation is in accord with the purpose of the statute. License plates need to be easily read in order to facilitate law enforcement and ordinary citizens in reporting and investigating hit-and-run accidents, traffic violations, gas-pump drive offs, and other criminal activity." Id.

A California appeals court reached the same conclusion, holding similar statutory language indicated the legislature intended "the view of the license plate be *entirely* unobstructed." People v. White, 113 Cal. Rptr. 2d 584, 586 (Cal. Ct. App. 2001) (emphasis added). The court determined the legislature, by using the unambiguous phrase "clearly visible," "meant a license plate must not be obstructed *in any manner* and must be *entirely* readable." Id. (emphasis added). This rationale is persuasive and strongly suggests the Nebraska legislature intended to prohibit obstructing license plate lettering in any manner and even to a minor degree.[16] Put

---

[16]The majority's brief analysis of the unpublished opinion in State v. O'Dell, No. A-01-1274, 2002 WL 31107578, at *6 (Neb. Ct. App. Sept. 24, 2002) (unpublished), does not persuade me otherwise. Ante at 16 & n.8. As the O'Dell court noted, the statute at issue in that case criminalized the "improper display" of license plates and said nothing about the "proper display" of plates or anything remotely related to the present requirement (since 2005) that a plate be "clear and distinct" so as to be "plainly visible." Id. The O'Dell court explained that in implying that the "proper display" of plates required a plate that was "visible," the Reiter panel "bootstrap[ped] a holding from statutory language which d[id] not exist." Id. The O'Dell court held, "Thus, to the extent that [Reiter] holds or suggests that there is a crime of 'improper display' of plates if a law enforcement officer cannot see 100 percent of the plate, we disagree with Reiter. It therefore logically follows that an officer stopping a vehicle for the reason that a trailer hitch partially interferes with his or her view of a number on a rear license plate is acting without legal authority and stopping a citizen for a crime which does not exist." Id. O'Dell is inapposite.

-31-

simply, a partially obstructed plate is not "clear and distinct" so as to be "plainly visible."

Here, there is no real question but that the rear-view camera partially obstructed the lettering on Martins's plate. Given the breadth of the plain language in § 60-399(2) and the "great deal of flexibility" afforded to officers in the field, an objectively reasonable officer could conclude Martins's admittedly obstructed plate was not "clear and distinct" so as to be "plainly visible" as required by the applicable Nebraska law now.

The majority finds this commonsense interpretation objectively unreasonable and therefore the stop unconstitutional, but Deputy Wintle and the district court are far from alone in construing the display statute that way. There is ample authority finding a reasonable basis for similar stops under strikingly similar circumstances. See, e.g., United States v. Boyd, 388 F. App'x 943, 947 (11th Cir. 2010) (unpublished per curiam) (holding that a license plate frame obscuring the registration decal provided an officer probable cause to believe a motorist violated a state law requiring "'all letters, numerals, printing, writing, and other identification marks' . . . to be 'clear and distinct . . . so that they will be plainly visible and legible'" quoting Fla. Stat. § 316.605(1)); United States v. Montes-Hernandez, 350 F. App'x 862, 868 (5th Cir. 2009) (unpublished per curiam) (similar); Davis v. Novy, 433 F.3d 926, 928, 930 (7th Cir. 2006) (same); United States v. Arciga-Bustamante, 276 F. App'x 716, 717, 719-20 (10th Cir. 2006) (unpublished) (same); United States v. Vargas, 57 F. App'x 394, 396-98 (10th Cir. 2003) (unpublished) (same); United States v. Walton, No. 1:03–00014, 2004 WL 3460842, at *4 (M.D. Tenn. Nov. 12, 2004) (same); Nelson v. State, 544 S.E.2d 189, 190 (Ga. Ct. App. 2001) (same).

In rejecting the district court's reasonable interpretation of § 60-399(2), the majority turns the logic of these cases upside down. Rather than give the terms "clear" and "distinct" their plain meaning, the majority ignores those clear terms. The

majority reduces the broad, descriptive phrases "clear and distinct" and "plainly visible" to vague variations of the solitary term "readable."[17] Ante at 11-12. The Nebraska legislature did not choose the readily available term "readable," a term with a different and narrower meaning than "clear and distinct" and "plainly visible at all times." While it makes sense to consider readability in determining whether a license plate violates § 60-399(2), given its purpose, nothing in the unambiguous statutory language supports making simple readability the determinative factor.

Indeed, Martins himself, relying on Reiter—the same case as the majority—reaches the opposite conclusion of the majority, asserting "Neb. Rev. Stat. § 60-399(2) does not mandate that a plate be 'clearly visible' or 'readable.'" It also does not follow that a plate that is "readable" is automatically "clear and distinct" and "plainly visible." See, e.g., People v. Duncan, 73 Cal. Rptr. 3d 264, 268 (Cal. Ct. App. 2008) (concluding a plate mounted upside down—though readable—was not "clearly legible" or easily readable because mounting the plate upside down made "the plate more difficult or confusing to read").

We have previously rejected the suggestion that an officer's ability "to read [a] plate while following" a vehicle meant "there was no violation of [local laws requiring the plate be 'plainly visible'] and thus no probable cause for the stop." Harris, 617 F.3d at 978. In Harris, we concluded the traffic stop did not violate the Fourth Amendment because, as in the present case, (1) "the district court believed the officer's testimony that the license plate was not plainly visible," (2) that "determination, based on credibility, [was] not clearly erroneous," and (3) "[t]he officer's conclusion . . . was objectively reasonable, as it complie[d] with Missouri decisions interpreting a similarly-worded state statute." Id. at 979. We should follow

---

[17]I have little doubt officers in the field will struggle to determine what the majority means by "reasonably readable" or "generally readable . . . from within a reasonable distance." Ante at 11-12.

-33-

our existing precedent and reach the same result here.[18]  See Owsley v. Luebbers, 281 F.3d 687, 690 (8th Cir. 2002) (per curiam) ("It is a cardinal rule in our circuit that one panel is bound by the decision of a prior panel.").

Despite the remarkable similarities between Harris and this case, the majority attempts to distinguish the case, "differentiat[ing] between a plate so obscured that an officer" "had to *get right up on the vehicle to get the license plate*" and Martins's admittedly obstructed plate.  Ante at 15 (quoting Harris, 617 F.3d at 978) (internal quotation marks omitted).  But Deputy Wintle's trial testimony, accepted as true by the majority, ante at 9, indicated Deputy Wintle "*had to get close to the vehicle* before [he] could actually see what state the vehicle was from" because the "camera mounted to the top of the plate . . . was obstructing the plate."  (Emphasis added).  There is simply no material difference between "get[ting] right up on the vehicle" in Harris and "get[ting] close to the vehicle" here.  Therefore, Harris should control this case under the same "practical and objectively reasonable standard."  Ante at 15.

To adopt the majority's reasoning, "'one must add words to the statute that simply are not there.'"[19]  State v. Magallanes, 824 N.W.2d 696, 701 (Neb. 2012) (quoting State v. Medina, No. A-11-377, 2011 WL 2577268, at *3 (Neb. Ct. App. June 28, 2011) (unpublished)).  This we should not do.  See Lozier Corp. v. Douglas Cnty. Bd. of Equalization, 829 N.W.2d 652, 656 (Neb. 2013) ("We give statutory

---

[18]The absence of a definitive interpretation of § 60-399(2) by the Nebraska courts does not deprive Deputy Wintle's interpretation of objective reasonableness, particularly given the authority applying similar state statutes the same way.  See United States v. Coleman, 700 F.3d 329, 334-35 (8th Cir. 2012) ("Considering the precedent at the time of the stop [including the lack of authoritative interpretation from the Nebraska Supreme Court], [the officer] had an objectively reasonable basis for believing [the motorist] violated the statute.").

[19]The majority's reliance on Reiter is problematic for the same reason.  As noted above, the O'Dell court criticized Reiter for "bootstrap[ing] a holding from statutory language which d[id] not exist."  O'Dell, 2002 WL 31107578, at *6.

-34-

language its plain and ordinary meaning, and we will not read into a statute a meaning that is not there.") (footnote omitted).

### D.     Objectively Reasonable Officer

Even if the experienced lower court judges and I are wrong about how the Nebraska Supreme Court would interpret § 60-399(2), see Smart, 393 F.3d at 771, at least our reasoning illustrates the meaning of the statute was sufficiently uncertain to make Deputy Wintle's interpretation reasonable. See United States v. Rodriguez-Lopez, 444 F.3d 1020, 1022-23 (8th Cir. 2006) ("Fortunately, we need not decide this issue [of statutory interpretation] because the resolution of the case turns upon whether [the officer's] belief that the statute was violated was objectively reasonable not whether it was in fact violated."). Whatever the correctness of the majority's statutory interpretation, Deputy Wintle did not have the benefit of that interpretation—or any guidance from the Nebraska courts on the statute at issue—at the time of the stop. See Washington, 455 F.3d at 827 (explaining prior judicial interpretations of a statute are "relevant to the objective reasonableness of the officer's belief").

The real question at this stage is not whether Deputy Wintle erred in interpreting the statute and believing he had a reasonable basis for the stop, but whether Deputy Wintle so obviously erred that no objectively reasonable officer could have reached that conclusion at the time of the stop. The Fourth Amendment allows room for reasonable mistakes in determining whether a motorist has violated a traffic law. Martin, 411 F.3d at 1002. ("[A] misunderstanding of traffic laws, if reasonable, need not invalidate a stop made on that basis."). And we routinely uphold traffic stops where "an expert defense attorney, and even a federal judge [or two], ultimately might conclude that the plain language of the [statute] technically requires" a different legal conclusion than that reached by the officer in the field. Id. at 1001-02 (deciding a traffic law's "level of clarity [fell] short of that required to declare [the officer's] belief and actions objectively unreasonable"); see also, e.g., United States

v. Hastings, 685 F.3d 724, 727-28 (8th Cir. 2012) (declining to determine whether a motorist's conduct "in fact" violated state law "because it was objectively reasonable for [the officer] to conclude that it" did); Sanders, 196 F.3d at 913 (refusing "to parse the words of [a] statute in determining whether [the officer] had probable cause to stop the vehicle" because the officer had an objectively reasonable basis for believing the motorist breached a traffic law regardless of whether an actual violation existed). It is not clear to me why the majority alters our usual practice in this case.

Under the majority's holding, Deputy Wintle could only have avoided running afoul of the Fourth Amendment if he had accurately predicted the majority's interpretation of the statute and broken off pursuit once he was able to read Martins's plate within some unspecified "reasonable distance." Ante at 12. The Fourth Amendment does not require officers to have such a technical understanding of the traffic code. See Ornelas, 517 U.S. at 695. Yet the majority requires Deputy Wintle to understand § 60-399(2) in a way most accomplished jurists have not.

### E.    Conclusion

If other federal and state courts consistently reach different conclusions from the majority's opinion here as to the meaning of the same or similarly worded statutes, how can this court fault Deputy Wintle for failing to anticipate the majority's unique interpretation of § 60-399(2)? I do not fault Deputy Wintle for his lack of psychic skill.

Based on the plain meaning of § 60-399(2) and Deputy Wintle's field observations of Martins's admittedly obstructed plate, as documented on the video recording of the stop and the attached record photographs of Martins's vehicle, I agree with the district court that Deputy Wintle had a reasonable basis to believe Martins's plate was not "clear and distinct" so as to be "plainly visible" as required by Nebraska law. Even assuming the plate were "not technically in violation of the statute," Sanders, 196 F.3d at 913, Deputy Wintle's "mistake was an 'objectively

-36-

reasonable one.'" <u>Herrera-Gonzalez</u>, 474 F.3d at 1109 (quoting <u>Martin</u>, 411 F.3d at 1001).  The traffic stop did not violate the Fourth Amendment, and Martins's remaining arguments are without merit.  I would affirm.



**Plaintiff's Exhibit 2**



**Plaintiff's Exhibit 3**

_____